UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MARKETXT HOLDINGS CORP.,

                Plaintiff,

          -against-                      08 Civ. 10265 (LAK)

ENGEL & REIMAN, P.C., BARRY S. ENGEL
and EDWARD D. BROWN,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

> Lester M. Kirshenbaum
> Margarita Y. Ginzburg
> Dina S. Rovner
> KAYE SCHOLER LLP
>
> Howard L. Simon
> WINDELS MARX LANE & MITTENDORF, LLP
>
> *Attorneys for Plaintiff*
>
>
> Eugene R. Licker
> Amanda W. Merkur
> LOEB & LOEB LLP
> *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiff ("Holdings"), a debtor acting pursuant to a confirmed Chapter 11 plan, brings

this action against Engel & Reiman, P.C. ("Engel Reiman"), a Colorado law firm, and Barry S. Engel

and Edward D. Brown, two of its shareholders, individually.  Plaintiff claims that the defendants knowingly assisted Omar Amanat, Holding's chief executive officer, in devising and implementing a fraudulent scheme to deprive Holdings of certain stock and to convert the proceeds of that stock to his own benefit.  It identifies two distinct transactions with respect to each of which, it alleges, the defendants aided and abetted fraud, breach of fiduciary duty, and conversion and they participated in a conspiracy to effectuate a fraudulent conveyance.  The matter is before the Court on the defendants' motion to dismiss the complaint for failure to state a legally sufficient claim.  For the reasons set forth below, the motion is granted.

*Facts*

The well pleaded factual allegations of the complaint are assumed to be true for the purpose of deciding the defendants' motion to dismiss.[1]

---

[1]

*Gonzalez v. Caballero*, 572 F. Supp. 2d 463, 466 (S.D.N.Y. 2008); *See also Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir. 1996).

In addition to the complaint, the plaintiff has submitted affidavits and additional exhibits [DI 30] in support of its memorandum of law opposing the defendant's motion to dismiss. Federal Rule of Civil Procedure 12(b) provides that if, on a motion to dismiss for failure to state a claim, "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment . . . and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." F. R. Civ. P. 12(b).  "When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment . . . and afford all parties the opportunity to present supporting material."  *Friedl v. New York*, 210 F.3d 79, 83 (2d Cir. 2000) (internal quotations omitted).  Accordingly, the Court is obliged either to exclude these materials or to convert the motion into one for summary judgment. *See Gurary v. Winehouse*, 190 F.3d 37, 42-43 (2d Cir. 1999) (upholding district court's consideration of affidavit and conversion of motion to dismiss to motion for summary judgment).  Plaintiff's affidavits speak primarily to the question whether the plaintiff has standing in this matter by virtue of an "innocent insider" exception to the *Wagoner* rule.  As the plaintiff's fraud claims are merely incidental to its conversion claims, the Court need not address this standing question.  The Court therefore excludes the affidavits.

*Holdings's Financial Distress*

Holdings (formerly known as Tradescape.com. LLC, Tradescape.com, Inc., Tradescape Corp., and TCorp.) was a corporation formed under Delaware law in March 1999 by Omar Amanat, who served as its chief executive officer.[2]  Amanat, his family, and various family-controlled trusts were the beneficial owners of roughly 51 percent of Holdings' common stock, and Amanat made all decisions for the company.[3]  Softbank Finance Japan ("Softbank") was the next largest shareholder, owning approximately 24 percent of Holdings' common stock in addition to three series of preferred stock.[4]  Seventy or so individuals and entities owned the remaining 25 percent of Holdings' common stock.[5]

In June 2002, Holdings sold one of its subsidiaries, Momentum, to E*TRADE Financial Corp. ("E*TRADE") in exchange for, *inter alia*, approximately 11.75 million shares of unregistered E*TRADE stock, 2.35 million of which immediately were placed in escrow for reasons not specified in the complaint.[6]  Following this sale, Holdings' primary assets were (1) its subsidiary, Inc., which was forced to shut down in July 2002 due to a net capital deficiency,[7] and (2) its

---

[2]    Compl. ¶¶ 4, 15.

[3]    *Id.*

[4]    *Id.*

[5]    *Id.*

[6]    *Id.* ¶ 10.

[7]    *Id.* ¶ 12.

E*TRADE stock.  Pursuant to a lock-up agreement with Holdings, Softbank had the contractual right to prevent Holdings from liquidating the 9.4 million shares of E*TRADE stock that was not placed in escrow.[8]

In the summer of 2002 and continuing into 2003, Holdings experienced increasingly severe financial difficulty, and Softbank pressed Holdings to repay certain of its loans.[9]  On January 27, 2003, Softbank and Holdings signed a settlement agreement that committed Holdings, *inter alia*, to obtain a loan against a large portion of its E*TRADE stock and to use the funds from that loan to make an initial payment to Softbank and two other creditors.[10]  Plaintiff alleges that Softbank, presumably pursuant to these contractual rights, could and would have prevented Amanat's diversion of company funds had it known of his scheme.[11]

*Amanat's Misconduct*

In the midst of Holdings' ongoing financial crisis, Amanat, with the defendants' knowledge and assistance, allegedly devised and implemented a secret scheme to deprive Holdings and its creditors of much of the value of Holdings' E*TRADE stock.[12]  The complaint describes a sequence of actions allegedly taken by Amanat from June 2002 through October 2003 that served to

---

[8]      *Id.* ¶ 11.

[9]      *Id.* ¶ 13.

[10]      *Id.* ¶¶ 13, 23.

[11]      *Id.* ¶ 16.

[12]      *Id.* ¶ 16.

convert the value of Holdings' E*TRADE stock shares to Amanat's personal use, thereby reducing Holdings to insolvency.

In February 2003, Amanat retained Engel Reiman, a law firm specializing in asset protection, to create an estate planning structure to protect Amanat's personal assets.[13]  Pursuant to this retainer,  defendants created two entities that were controlled by Amanat: (1) Epoch, a Colorado limited partnership, and (2) Epic, a Cook Islands trust.[14]  In addition, Amanat and alleged co-conspirator Rauf Ashraf formed another limited partnership, Empyrean Investment Fund, LP ("EIF"), which they jointly controlled.[15]

In furtherance of the Holdings/Softbank settlement described above, Amanat signed a contract between Holdings and EIF on March 28, 2003 pursuant to which Holdings pledged the 9.4 million shares of its E*TRADE stock that had not been placed in escrow to EIF to secure a "loan" of about $12 million, roughly 50 percent of the stock's then-market value.[16]  Amanat then had Holdings re-register 6.7 million of those pledged E*TRADE shares in EIF's name as collateral for the loan.[17]  The Holdings/EIF agreement, the terms of which plaintiff alleges were made public to creditors and shareholders, required EIF to return all of the pledged shares, including those re-

---

[13]  *Id.* ¶ 17.

[14]  *Id.* ¶¶ 18-19.

[15]  *Id.* ¶ 21.

[16]  *Id.* ¶¶ 23, 25.

[17]  *Id.* ¶ 23.

registered in EIF's name, to Holdings once the loans were repaid.[18]  Instead, plaintiff alleges that Amanat, with the defendants' continued knowing assistance, used the newly created business entities described above fraudulently to misappropriate the value of Holdings' E*TRADE stock through two transactions.

*The STARS Transaction*

First, because EIF did not have money of its own to lend to Holdings as required by the Holdings/EIF agreement, it entered into a prepaid forward transaction (the "STARS Transaction") with Bank of America ("BoA") on April 8, 2003, pursuant to which BoA paid $27.4 million to EIF and EIF irrevocably transferred the 6.7 million shares of Holdings' E*TRADE stock that Amanat recently had re-registered in EIF's name to BoA.[19]  Plaintiff alleges that Amanat arranged this deal knowing that it would prevent Holdings ever from recovering those shares of E*TRADE from EIF.[20] On April 9, 2003, pursuant to the terms of hte Holdings/EIF agreement, EIF loaned roughly $12 million of the STARS Transaction proceeds to Holdings, which used those funds to pay Softbank and other Holdings creditors.[21]  EIF retained the $15.5 million balance from the STARS transaction.

Plaintiff alleges that Amanat, with defendants' knowledge and assistance, appropriated $12.3 million of the $15.5 million balance from the STARS transaction for himself by secretly

---

[18]    *Id.*

[19]    *Id.* ¶ 24.

[20]    *Id.*

[21]    *Id.*

transferring it from EIF to Epoch's Swiss bank account and then back to the United States as investments by Epic and Epoch, for Amanat's benefit, in a hedge fund owned and managed by Ashraf.[22]

*The Collar Transaction*

On May 9, 2003, Amanat engineered a second transaction, this time between Holdings and BoA directly (the "Collar Transaction"), in which Holdings sold to BoA for approximately $14.6 million the remaining 2.4 million shares[23] of E*TRADE stock that had been pledged to EIF but had not been re-registered in its name.[24]  Plaintiff alleges that Amanat hid this transaction and its proceeds from Holdings' shareholders and creditors and that he retained control over the $14.6 million in proceeds by transferring them to the Sanford C. Bernstein account of TCorp Technologies, LLP, another company formed and controlled by Amanat.[25]  Plaintiff further alleges that, in August 2003, Amanat intentionally transferred $13.2 million of these proceeds, which properly belonged to

---

[22]

    *Id.* ¶¶ 25, 52.

[23]

    Defendants' brief correctly notes that plaintiff's math regarding the E*TRADE shares appears not to add up.  *See* Def. Mem. Supp. Mot. to Dismiss [hereinafter "Def. Mem."] 6 n.7.  If Holdings pledged 9.4 million shares to EIF and EIF sold 6.7 million of those shares to BoA in the STARS Transaction, then that should have left 2.7 million shares – not the "remaining 2.4 million shares" plaintiff asserts – held by EIF and belonging to Holdings. This apparent inconsistency is not material to disposition of this motion, however, and the Court takes as true plaintiff's repeated assertion that the "remaining 2.4 million shares" were liquidated in the Collar Transaction.

[24]

    *Id.* ¶ 26.

[25]

    *Id.*

Holdings, to Ashraf's hedge fund for Amanat's personal benefit.[26]

*Defendants' Knowledge and Assistance*

Plaintiff alleges that the defendants, throughout their professional relationship with Amanat, knew or consciously avoided knowing that Amanat intended to use the asset protection structure they designed for illegal purposes.  From their earliest interactions with Amanat, the defendants allegedly knew that he was a fiduciary of Holdings, that the E*TRADE stock belonged to Holdings rather than to Amanat, and that Holdings had many creditors claiming millions of dollars in outstanding loans.[27]  In particular, plaintiff points to an assortment of emails, notes, documents, and internal memoranda prepared or received by the individual defendants and their employees that allegedly demonstrated defendants' knowledge of Amanat's intended misconduct and illegal use of the asset protection structure they created.[28]

In addition, plaintiff alleges facts intended to show that the defendants were instrumental in facilitating Amanat's misappropriation of proceeds from both the STARS and Collar Transactions.  Plaintiff claims that, between May and July 2003, the defendants assisted Amanat in converting $12.3 million of Holdings' E*TRADE stock proceeds from the STARS Transaction to his own use by helping him transfer that money to Epoch and by opening a Swiss bank account on

---

[26]

    *Id.* ¶ 57.

[27]

    *Id.* ¶ 27.

[28]

    *See* ¶¶ 28-47.

Amanat's behalf and facilitating further transfers of the proceeds to and from that account.[29]   It alleges also that the defendants knowingly assisted Amanat's conversion of the Collar Transaction proceeds by facilitating the transfer of $13.2 million from TCorp's Sanford C. Bernstein account into Ashraf's hedge fund as an investment in Epic's name for Amanat's personal benefit.[30]   In particular, defendants provided an opinion letter to Bernstein stating that to their knowledge the intended transfer would not violate any state or federal laws.[31]   Plaintiff alleges that Bernstein would not have permitted the funds to be transferred without this letter.[32]

*Holdings' Bankruptcy and the Complaint*

On March 26, 2004 an involuntary bankruptcy petition under Chapter 7 of the Bankruptcy Code was filed against Holdings in the Southern District of New York.[33]   That case was converted to a voluntary bankruptcy under Chapter 11 by order dated December 2, 2004. Subsequently, the bankruptcy court appointed a trustee[34] who filed an involuntary petition against Epoch, which was substantively consolidated with the Holdings estate in January 2008.[35]   On May

---

[29]  *Id.*¶¶ 48-52.

[30]  *Id.* ¶¶ 53-63.

[31]  *Id.* ¶¶ 59-61.

[32]  *Id.* ¶ 59, 60, 62.

[33]  *Id.* ¶ 5.

[34]  *Id.* ¶ 6.

[35]  *Id.* ¶ 7.

30, 2008, the court confirmed the proposed bankruptcy plan,[36] which authorized the Plan Committee and the Responsible Officer to bring suits to enforce all causes of action and claims retained by the consolidated debtor Holdings.[37]  This action was brought pursuant to that authority on November 25, 2008.

The amended complaint contains four different claims for relief with respect to each of the two transactions described above: (1) aiding and abetting fraud; (2) aiding and abetting breach of fiduciary duty; (3) aiding and abetting conversion; and (4) conspiracy to effectuate a fraudulent conveyance.  The defendants challenge the sufficiency of all eight claims.  They raise also two threshold issues that bear importantly on disposition of this motion.

First, defendants argue that plaintiff's fraud claims are merely incidental to its conversion claims and that the shorter statute of limitations for conversion bars the plaintiff from recovering on its aiding and abetting theories.[38]  In the alternative, defendants argue that the plaintiff does not have standing to assert accessorial liability claims against outside counsel under the *Wagoner* rule and that none of the exceptions to that rule applies.[39]  In any case, the defendants argue that the plaintiff fails to plead its claims with sufficient particularity.

---

[36]

     *Id.* ¶ 8.

[37]

     *Id.*

[38]

     Def. Mem. 11-16.

[39]

     *Id.* at 16-21.

*Discussion*

*The Motion to Dismiss Standard*

In deciding a motion to dismiss, a court must accept as true all well pleaded facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor.[40]  At the same time, "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss.'"[41]  A court must apply a "plausibility standard": while "not akin to a 'probability requirement' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully."[42]  The plaintiff must plead "factual allegations sufficient 'to raise a right to relief above the speculative level.'"[43]  Such motions are addressed to the face of the pleadings, but a court may consider also documents attached to the complaint as exhibits or incorporated into it by reference.[44]

A claim alleging fraud, or aiding and abetting fraud,[45] must satisfy also Rule 9(b),

---

[40]

See *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[41]

*Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006).

[42]

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009).

[43]

*Boykin v. KeyCorp*, 521 F.3d 202, 213 (2d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[44]

*Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000).

[45]

See *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006) (applying Rule 9(b) to claim for aiding and abetting fraud).

which requires that a plaintiff "state with particularity the circumstances constituting fraud."[46]  It must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[47]  "Malice, intent, knowledge, and other conditions of a person's mind may be averred generally,"[48] but "plaintiffs must allege facts that give rise to a strong inference of fraudulent intent."[49]  A plaintiff may accomplish this by "'(1) alleging facts to show that defendant[] had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"[50]

*The Aiding and Abetting Claims*

The fundamental question with respect to plaintiff's aiding and abetting claims is whether the underlying conduct is properly characterized as fraud or conversion for purposes of statutes of limitation.  Under New York law,[51] a plaintiff must adequately allege three elements in

---

[46]  FED. R. CIV. P. 9(b).

[47]  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2nd Cir. 1995) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

[48]  FED. R. CIV. P. 9(b).

[49]  *Acito*, 47 F.3d at 52.

[50]  *DIMON Inc. v. Folium, Inc.*, 48 F. Supp. 2d 359, 372 (S.D.N.Y. 1998) (quoting *S.Q.K.F.C., Inc. v. Bell Atlantic TriCon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)).

[51]  The parties agree that New York law, including its statutes of limitation, governs this diversity action.  *See* Def. Mem. 11; Pl. Mem. Opp. Mot. to Dismiss [hereinafter "Pl. Mem."] 26.

order to make out a claim for aiding and abetting tortious conduct: "the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance."[52]  Here the plaintiff alleges aiding and abetting liability with respect to alleged primary violations by Amanat based on three different theories – fraud, conversion, and breach of fiduciary duty – each with regard to two separate transactions.  The statute of limitations for each aiding and abetting claim is determined by the underlying tort.  For fraud – actual or constructive, although the plaintiff appears not to allege the latter[53] – the statute of limitations is six years, whereas for conversion the limitations period is only three years.  Nonetheless, a fraud-based claim will be barred by a shorter statute of limitations if the fraud allegation is "merely incidental"[54] to a claim with a shorter limitations period.

"'In applying a Statute of Limitations it is basic that one look to the essence of plaintiff's claim and not to the form in which it is pleaded.'"[55]  If the principal underlying tort alleged

---

[52]

       *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009); *see also Design Strategy, Inc. v. Davis,* 469 F.3d 284, 303 (2d Cir. 2006) (aiding and abetting breach of fiduciary duty); *JP Morgan Chase Bank v. Winnick,* 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) (aiding and abetting fraud); *Calcutti v. SBU, Inc.*, 273 F. Supp. 2d 488, 493 (S.D.N.Y. 2003) (aiding and abetting conversion).

[53]

       Actual fraud requires an intentional material misrepresentation or omission by defendant on which plaintiff reasonably relied to his detriment.  Constructive fraud requires the same elements except that the existence of a fiduciary duty replaces *scienter*.

[54]

       *Gold Sun Shipping Ltd. v. Ionian Transport Inc.*, 245 A.D.2d 420, 421, 666 N.Y.S.2d 677, 678 (2nd Dep't 1997) ("Since the cause of action alleging fraud was merely incidental to the conversion cause of action, and the only purpose it serves in the complaint is to avoid the Statute of Limitations, the cause of action alleging fraud was properly dismissed.") (citations omitted).

[55]

       *Corcoran v. New York Power Authority*, 202 F.3d 530, 544-45 (2d Cir. 1999) (quoting *State v. Cortelle Corp*, 38 N.Y.2d 83, 86, 378 N.Y.S.2d 654, 656 (N.Y. 1975)).

here is fraud, as plaintiff claims, then the plaintiff should get the benefit of fraud's longer statute of limitations with respect to the fraud and breach of fiduciary duty claims.  If the real substance of the claim is conversion, however, as defendants assert, then plaintiff cannot avoid the shorter statute of limitations merely by labeling the defendants' conduct "fraudulent" throughout the complaint.  Notwithstanding plaintiff's frequent and conclusory assertions to the contrary, the gravamen of plaintiff's claims is that Amanat stole money from Holdings, not that he lied about doing so.  As explained in detail below, the shorter statute of limitations therefore bars all of plaintiff's aiding and abetting claims.

*Claims 1 and 5: Aiding and Abetting Fraud*

Claims 1 and 5 allege that the defendants aided and abetted Amanat in defrauding Holdings of the value of certain proceeds from the STARS and Collar Transactions.  The defendants challenge both the sufficiency and the timeliness of these claims.  Because the Court agrees with defendants that the fraud claims are merely incidental to plaintiff's claims for aiding and abetting conversion, the Court need not address the defendant's arguments regarding standing[56] and sufficiency of the pleadings.

As an initial matter, defendants argue that the plaintiff's allegations of fraud are merely incidental to its conversion claims and that the shorter statute of limitations for conversion therefore bars all of the plaintiff's claims for accessorial liability.  In New York, the statute of

---

[56] The Second Circuit recently has certified to the New York Court of Appeals a number of questions regarding application of the adverse interest exception to the *Wagoner* rule and the sole actor exception to that exception (sometimes styled the innocent insider exception to the *Wagoner* rule).  *See Kirschner v. KPMG LLP*, 590 F.3d 186 (2d Cir. 2009).

limitations for conversion is three years.[57]   The statute of limitations for "an action based upon fraud"[58] is longer: "either six years from when the cause of action accrued or two years from the time plaintiff discovered the fraud or could have with reasonable diligence discovered it," whichever is longer.[59]   Where a plaintiff brings both fraud and conversion claims, however, New York courts will not apply the longer limitation if the fraud claim is merely incidental to that for conversion.[60]   This essentially is a question of characterization – are the plaintiff's allegations of fraud independently viable or do they merely follow-on the conversion claim?

When a fraud claim is incidental to another asserted claim, the claim does not sound in fraud for purposes of taking advantage of the longer limitations period,"[61] "otherwise fraud would be used as a means to litigate stale claims."[62]   Courts applying New York law have characterized "incidental" fraud claims in different ways depending on the particular theories of liability at issue. Where a plaintiff alleged both battery and fraud claims against an employer, the Second Circuit stated

---

57

       N.Y. C.P.L.R. § 214(3).

58

       *Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 459 (S.D.N.Y. 2009) (applying six-year statute of limitations to both fraud and aiding and abetting fraud claims).

59

       *Cruden v. Bank of New York*, 957 F.2d 961, 973 (2d Cir. 1992); *see also* N.Y. C.P.L.R. § 213(8).

60

       *Malmsteen v. Berdon, LLP*, 477 F. Supp. 2d 655, 663 (S.D.N.Y. 2007) (citing *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 119, 490 N.Y.S.2d 190, 192 (1st Dep't 1985)).

61

       *Id.* at 545.

62

       *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 119-20, 490 N.Y.S.2d 190, 192 (1st Dep't 1985).

that "[a] fraud action is not incidental only when: (1) the fraud occurred separately from and subsequent to the injury forming the basis of the alternate claim; and (2) the injuries caused by the fraud are distinct from the injuries caused by the alternate claim."[63]  Another court in another context similarly focused on whether the fraud claim at issue was independently viable.  Where allegations of fraud "at most . . . represent the means of accomplishing the alleged misappropriation . . . [they are] only an incident of that wrong . . . . [W]ithout the alleged misappropriation plaintiff would have no claim at all."[64]  Often courts look to the relief requested in making this determination, finding fraud claims incidental where the measure of the requested relief is the same for both types of claims and seems to take its substance from the non-fraud claim.  Motivating these different methods of analysis is the premise that, on the facts as pleaded in the complaint, a fraud claim must have meaning and force independent of the plaintiff's other claims in order for the plaintiff properly to benefit from its longer statute of limitations.

Applying this analysis here, the Court holds that the plaintiff's fraud claims are merely incidental to its claims of conversion.  Under New York law, "a conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."[65]  "The usual measure

---

[63]

    *Corcoran*, 202 F.3d at 545.

[64]

    *Powers Mercantile Corp.*, 109 A.D.2d at 121; *see also Malmsteen*, 477 F.Supp.2d at 663 ("In analyzing whether the allegations of fraud are incidental, a Court must examine the viability of the fraud cause of action."); *DeVito v. New York Cent. System*, 22 A.D.2d 600, 603, 257 N.Y.S.2d 895 (1st Dep't 1965) ("[T]he Statute of Limitations for fraud applies whenever the act of fraud is extrinsic to, and different from, the barred cause of action.").

[65]

    *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50, 827 N.Y.S.2d 96, 100 (N.Y. 2006); *see also id.* ("Two key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or

of damages for conversion is the value of the property at the time and place of conversion, plus interest."[66]  Whereas conversion claims seek compensation for theft, fraud claims seek to remedy damage caused by deception itself.  Common law fraud can be of two types – "actual" or "constructive."  Under New York law, actual fraud requires "[1] a misrepresentation or a material omission of fact which was false and known to be false by defendant, [2] made for the purpose of inducing the other party to rely upon it, [3] justifiable reliance of the other party on the misrepresentation or material omission, and [4] injury."[67]  "Constructive fraud requires establishing these same elements, except that scienter is replaced by a fiduciary or confidential relationship between the parties."[68]

The gravamen of plaintiff's amended complaint is that the defendants helped Amanat steal assets properly belonging to Holdings on two different occasions.  All of Amanat's alleged fraudulent conduct was in furtherance of this scheme to divert corporate assets to his own use, and this conduct did not cause cognizable damage to Holdings independent of that conversion.  Moreover, plaintiff has not alleged that Holdings itself relied to its detriment on any specific misrepresentations made by Amanat.  Instead, plaintiff's fraud claims appear to rely on an expansive theory of omission-based liability, although this is not clearly pled.  Presumably Holdings would have tried to stop

---

interference with it, in derogation of plaintiff's rights.").

[66] *Fantis Foods, Inc. v. Standard Importing Co., Inc.*, 49 N.Y.2d 317, 326, 425 N.Y.S.2d 783, 786 (N.Y. 1980).

[67] *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 80 (N.Y. 1996)) (internal citations omitted).

[68] *E*TRADE Financial Corp. v. Deutsche Bank AG*, 631 F. Supp. 2d 313, 387 (S.D.N.Y. 2009) (internal quotation marks and citation omitted).

Amanat but for the fact that he did not tell the company that he intended to divert certain proceeds from the STARS and Collar Transactions to his own personal use.  Ultimately, however, it is the theft itself – not the deception that was in service to, and a logical incident of, that theft – that forms the basis for all of plaintiff's claims.  With respect to each transaction, the plaintiff seeks precisely the same damages on each of its four theories of liability: it claims exactly the amount of proceeds that Amanat allegedly diverted to his own use from the STARS and Collar Transactions, $12.3 million and $13.2 million respectively, plus interest.  Aside from the alleged conversions themselves, the plaintiff does not claim any cognizable damage from Amanat's allegedly fraudulent behavior.  But for the alleged conversions, plaintiff could not make out an underlying primary violation on which to base its allegations of secondary liability regarding the defendants.  As a result, plaintiff's case rises or falls with its conversion claims.  The plaintiff cannot take advantage of the longer limitations period where "the cause of action alleging fraud is merely incidental to the conversion and thus the only purpose it serves is to avoid the three-year Statute of Limitations."[69]

   The Court notes also that even if plaintiff's fraud claims were not merely incidental to its conversion claims, plaintiff has not alleged most of the necessary elements with sufficient particularity under Rule 9(b).  Plaintiff alleges only one specific instance of misrepresentation by Amanat – (1) his July 17, 2003 affidavit, in which he stated that "most of the [E*TRADE stock pledged to EIF] has not been converted into cash"[70] – but plaintiff does not clearly or specifically allege any particular reliance by the plaintiff on this misrepresentation.  The allegations regarding fraudulent omissions are similarly lacking.  Holdings alleges in vague terms throughout the complaint

---

[69]
   *Rattenni v. Cerreta*, 285 A.D.2d 636, 636-37, 728 N.Y.S.2d 401, 401 (2nd Dep't 2001).

[70]
   Compl. ¶ 22.

that Amanat concealed various aspects of his intentions and his illegal conduct.[71]  It fails, however, adequately to allege its own reliance on these claimed omissions.[72]  Without plausible, specific allegations of such reliance, these broad general assertions of intentional secrecy do not sufficiently plead fraud.  A constructive fraud theory, which plaintiff does not appear to have pled,[73] would be no more helpful to plaintiff in this respect.  Reliance and proximate cause, not intent,[74] are the crux of plaintiff's pleading deficiency here, and they are just as problematic for plaintiff on a theory of constructive, as opposed to actual, fraud.[75]  This analysis only reinforces the conclusion that

---

[71]
       *See, e.g.*, *id.* (describing how Amanat "secretly monetized the E*TRADE stock" and "planned to hide the transfers [of the proceeds] even further by placing that cash in Ashraf's hedge funds").

[72]
       *See, e.g.*, *id.* ¶ 16 (claiming that "other parties with substantial interests in Holdings, such as Softbank, . . . could have prevented the fraud had it been known to them").

[73]
       Plaintiff explicitly alleges Amanat's fraudulent intent throughout the complaint.  *See, e.g.*, Compl. ¶ 1 ("[Amanat] devised and implemented a fraudulent scheme to deprive Holdings of 9.4 million shares of E*TRADE stock owned by Holdings . . . and to keep the proceeds of that stock . . . for himself.").  Nowhere does plaintiff suggest constructive fraud as an alternative theory of liability, except perhaps implicitly in that plaintiff alleges also a breach of fiduciary duty claim.

[74]
       *See Bibeau v. Ward*, 228 A.D.2d 943, 944, 645 N.Y.S.2d 107, 110 (3d Dep't 1996) ("Even accepting that a fiduciary relationship existed between the parties, that will substitute only for the element of scienter, not for reliance.  Under these circumstances, plaintiff failed to sustain his claim of fraud.") (citation omitted).

[75]
       There is some disagreement among courts in the Second Circuit as to whether Rule 9(b) governs constructive fraud claims.  *Compare Matsumura v. Benihana Nat. Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) (claiming that "courts in the Second Circuit have applied Rule 9(b) to any cause of action that bears a close legal relationship to fraud or mistake," including constructive fraud) *with Cendant Corp. v. Shelton*, 474 F. Supp. 2d 377, 380 (D. Conn. 2007) ("Courts have not applied Rule 9(b) to claims of constructive, rather than actual, fraud.").  The Court notes that this disagreement largely may be attributed to problems of language and that constructive fraud of the type at issue here appears properly subject to Rule 9(b)'s requirements.  *See In re RSL COM PRIMECALL, Inc.*, 2003 WL 22989669, *3 (Bkrtcy. S.D.N.Y. 2003) (distinguishing "constructive fraud claims," properly subject to Rule 9(b), from "constructive fraudulent transfer claims," which involve no

plaintiff's action fundamentally is about the damage done by Amanat's alleged theft rather than his alleged deception.

### Claims 3 and 7: Aiding and Abetting Conversion

Assuming *arguendo* that the plaintiff has pled underlying acts of conversion sufficiently, these claims are time-barred. As explained above, C.P.L.R. § 214(3) prescribes a three year limitations period for conversion claims. "[A]ccrual runs from the date the conversion takes place and not from discovery or the exercise of diligence to discover."[76] Even assuming plaintiff sufficiently has alleged the underlying conversion violations with respect to the STARS and Collar Transactions, these causes of action accrued no later than October 2003, the latest time of any action by any party alleged in the amended complaint. The statute of limitations for aiding and abetting claims based on the alleged conversions therefore expired no later than October 2006. Moreover, to the extent that Section 108 of the Bankruptcy Code tolled the period of limitation for an additional two years, that tolling period ended March 26, 2006, two years after Holdings' involuntary bankruptcy was filed.[77] This action was not commenced until November 25, 2008, well after both the three-year statute of limitations and the bankruptcy tolling period ended.

---

element of fraud and do not fall under Rule 9(b) but which frequently are referred to also as "constructive fraud"). Nonetheless, the Court finds that with respect to the element of reliance, plaintiff fails sufficiently to allege Amanat's underlying fraud under either Rule 9(b)'s heightened pleading standard or the general Rule 8(a) "plausibility" standard as articulated in *Twombly* and *Iqbal*.

[76]

*Vigilant Ins. Co. of America v. Housing Authority of City of El Paso*, 87 N.Y.2d 36, 637 N.Y.S.2d 342 (1995) (citations omitted).

[77]

11 U.S.C. § 108; *see also In re Magnesium Corp. of America*, 399 B.R. 722, 743 (Bankr. S.D.N.Y. 2009) (explaining application of § 108).

*Claims 2 and 6: Aiding and Abetting Breach of Fiduciary Duty*

New York law does not provide a single prescriptive period for breach of fiduciary duty or the aiding and abetting thereof.  Instead, courts look to "the substantive remedy which the plaintiff seeks" to determine the applicable period of limitation.[78]  "[W]here suits alleging a breach of fiduciary duty seek only money damages, courts have viewed such actions as alleging 'injury to property,' to which a three-year statute of limitations applies.'"[79]  However, "a cause of action for breach of fiduciary duty based on allegations of . . . fraud is subject to a six-year limitations period."[80]

Plaintiff's fraud claims are merely incidental to its conversion claims, and the gravamen of Amanat's alleged breach of fiduciary duty is conversion rather than fraud.[81]  "Under New York law, a claim for breach of a fiduciary duty requires a showing of (1) the existence of a fiduciary relationship, (2) the intentional or negligent breach of that duty, and (3) damages suffered

---

[78]

*Ciccone v. Hersh,* 530 F. Supp. 2d 574, 579 (S.D.N.Y. 2008) (quoting *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.*, 157 F.3d 933, 942 (2d Cir.1998)); *see also Malone v. Bayerische Hypo-Und Vereins Bank*, 2010 WL 391826, *5 (S.D.N.Y. 2010) (citations omitted).

[79]

*Kaufman v. Cohen,* 307 A.D.2d 113, 118, 760 N.Y.S.2d 157, 164 (1st Dep't 2003)).

[80]

*Id.* at 119.

[81]

A close reading of the amended complaint supports this conclusion.  Counts 2 and 6, summarizing the two claims for aiding and abetting Amanat's breach of fiduciary duty, describe the underlying breaches in nearly identical language that clearly sounds in conversion rather than fraud, notwithstanding plaintiff's gratuitous characterizations of the scheme as "fraudulent."  *See* Compl. ¶¶ 76, 80, 104, 108 (describing how defendants' actions facilitated Amanat's "fraudulent scheme to deprive Holdings of [proceeds] . . . and keep that cash for himself" and how they "enabled [him] to misappropriate . . . Holdings' cash for his own benefit.).

22

because of that breach."[82]   As its chief executive officer, Amanat clearly owed fiduciary duties of care and loyalty to Holdings.  If Amanat breached those duties as alleged, however, he did so by stealing the company's assets, not simply by concealing his plan to do so, or its success, from the company. Plaintiff has alleged precisely the same damages – exactly the amount of proceeds diverted by Amanat to his own use, plus interest – with respect to breach of fiduciary duty as it has for conversion and fraud.  Because the plaintiff's breach of fiduciary duty claims are grounded in conversion rather than fraud, they are subject to the shorter three-year statute of limitations and are time-barred.

*Conspiracy to Effectuate a Fraudulent Transfer*

Claims 4 and 8 allege that the defendants conspired to effectuate fraudulent conveyances of proceeds from the STARS and Collar Transactions respectively.[83]   In New York, "'[A] mere conspiracy to commit a [tort] is never of itself a cause of action.'   Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."[84]   A claim of civil conspiracy therefore requires "a threshold determination that the plaintiff has adequately alleged an actionable underlying tort."[85]   The plaintiff's amended complaint

---

[82]

> *In re Parmalat Securities Litigation*, --- F. Supp. 2d ---, 2010 WL 545964, *15 (S.D.N.Y. Feb. 17, 2010).

[83]

> Compl. ¶¶ 89-94, 117-22.

[84]

> *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546 (N.Y. 1986) (citations omitted); *see also Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy.").

[85]

> *In re Magnesium Corp. of America*, 399 B.R. 722, 775 (Bankr. S.D.N.Y. 2009).

23

does not include any claims for fraudulent conveyance.[86]  For that matter, in light of the Court's

dismissal of the aiding and abetting claims above, no other adequately pleaded, actionable tort

remains on the face of the complaint.  Accordingly, plaintiff's claims of conspiracy to effectuate a

fraudulent conveyance are dismissed.


*Conclusion*

For the foregoing reasons, the defendants' motion to dismiss the amended complaint

[DI 24] is granted.  The Clerk shall enter final judgment of dismissal.

SO ORDERED.

Dated:         March 15, 2010


_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)

---

[86]
Nor does it appear likely that it could do so.  Courts generally do not recognize a cause of action for fraudulent conveyance against defendants who were neither transferees nor beneficiaries of an allegedly fraudulent transfer.  *See id.* at 771 & n. 169 (listing New York-law based federal and state opinions); *FDIC v. Porco*, 75 N.Y.2d 840, 842, 552 N.Y.S.d 910, 911 (1990) ("[T]he statute . . . cannot fairly be read as creating a remedy against nontransferees who, like defendants here, are not alleged to have dominion or control over those assets or to have benefitted in any way from the conveyance.").